UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY — TRENTON VICINAGE

ANDRE JASON WATTS,

Plaintiff, pro se,

v.

CBRE GROUP, INC. and BEIGENE USA, INC.,

Defendants.

Civil Action No. 3:25-cv-04483-RK-JTQ

AMENDED COMPLAINT

(Prepared under Fed. R. Civ. P. 1, 8(a)(2), 8(e), 10(b), 11(b), 15(a)(2), 37(e), and 54(c); construed liberally under Haines v. Kerner, 404 U.S. 519 (1972), and Erickson v. Pardus, 551 U.S. 89 (2007); pled to full plausibility under Twombly, 550 U.S. 544 (2007), and Iqbal, 556 U.S. 662 (2009).)

TABLE OF CONTENTS

(Page numbers will be locked when the final PDF is generated.)

I. Introduction ……………………………………………………………………………………………………… p. 1

II. Defined Terms …………………………………………………………………………………………………… p. 7

III. Jurisdiction and Venue ………………………………………………………………………………… p. 10

IV. Parties ……………………………………………………………………………………………… ……………………. p. 12

V. Factual Allegations ………………………………………………………………………………………… p. 15

A. Employment Background

B. Development of WattsProtect™ (“Invention”)

C. Policy 6.4 Disclosure (May 5)

D. Retaliation (May 5–7)

E. May 8 Meeting (George Murray — CBRE / BeiGene personnel)

F. Coerced Interrogation (May 8 Afternoon)

G. Removal From Worksite

H. Wage Delay & HR Contradictions

I. NDA and Legal Hold (May 15)

J. Termination (May 16)

K. June Events (Side Hustle Rumor; Laptop Retrieval Attempt; Hearings)

VI. Causes of Action ………………………………………………………………………………………… p. 48

Count I — CEPA Retaliation (Dzwonar; Abramson; Fuentes)

Count II — Pierce Public-Policy Retaliation

Count III — DTSA Misappropriation (Rockwell Graphic Sys.)

Count IV — NJTSA Misappropriation

Count V — Breach of Contract (NDA)

Count VI — Breach of Implied Covenant (Sons of Thunder; Wilson)

Count VII — NJ Wage Payment Law

Count VIII — Tortious Interference (Printing Mart-Morristown)

Count IX — Declaratory Judgment (28 U.S.C. § 2201(a))

VII. Prayer for Relief ........................................................................................................ p. 198

VIII. Jury Demand ................................................................................................................ p. 210

IX. Rule 11 Certification ................................................................................................ p. 212

X. Chronology Appendix ................................................................................................ p. 214

I. INTRODUCTION

1. Plaintiff Andre Jason Watts ("Plaintiff") submits this fully rewritten, fully enhanced, fully integrated Amended Complaint, in strict compliance with the Court's directive to submit a standalone pleading containing all operative facts and claims.

2. This Complaint is written both:

a. in accordance with Rule 8(a)(2) (short and plain statement), and

b. with the full factual detail necessary to satisfy Twombly, Iqbal, and Third Circuit plausibility standards.

3. Because Plaintiff proceeds pro se, this Court must liberally construe his filings under Haines v. Kerner, 404 U.S. 519 (1972) and Erickson v. Pardus, 551 U.S. 89 (2007).

4. This pleading also adheres to:

• Rule 1, requiring a "just, speedy, and inexpensive determination";

• Rule 8(e), requiring pleadings to be construed to "do justice";

• Rule 10(b), requiring separate counts;

• Rule 15(a)(2), permitting amendments when justice requires;

• Rule 37(e), governing preservation of electronically stored information;

• Rule 54(c), authorizing relief beyond what is specifically requested.

5. This action arises from severe retaliation, coercion, misappropriation, and wrongful termination following Plaintiff's good-faith May 5, 2025 Policy 6.4 disclosure of his independently developed invention WattsProtect™ ("Invention").

6. The Invention is an AI-driven calibration-integrity and evidence-preservation architecture that Plaintiff created on his own time, with no CBRE resources, and later protected through:

• a provisional patent (April 30),

• a formal Non-Disclosure Agreement ("NDA") (May 15), and

• a Rule 37(e) Legal Hold (May 15).

7. Within 48 hours of disclosure, CBRE escalated retaliation, including:

a. false "conflict of interest" claims;

b. coerced IP interrogation;

c. viewing confidential material on Plaintiff's personal phone;

d. removal from the worksite;

e. wage interference;

f. HR contradictions (active vs. offboarding);

g. restriction of Plaintiff's HR access;

h. termination within 24 hours of an NDA and Legal Hold.

8. Central to the facts is a May 8, 2025 calibration meeting, attended by:

• CBRE staff member George Murray, and

• BeiGene personnel,

during which Murray slammed his hands on the table aggressively, creating a hostile and unsafe environment and triggering Plaintiff's later attempt to report the incident — an action which CBRE then used to intensify retaliation.

9. Equally relevant is the attempted retrieval of Plaintiff's work-issued BeiGene ThinkPad on June 13, 2025, even though CBRE's HR system still listed him as active, and even though the laptop contained sensitive calibration data and evidentiary material.

10. On June 23, 2025, CBRE expressly admitted in open court that it did not own and did not claim ownership of WattsProtect™, eliminating any dispute over Plaintiff's exclusive IP rights.

11. This Complaint includes all events from April 30 through June 30, all necessary to evaluate:

• retaliation (CEPA),

• public-policy discharge (Pierce),

• trade secret misappropriation (DTSA/NJTSA),

• breach of contract (NDA),

• wage violations,

• tortious interference, and

• declaratory judgment.

12. The causes of action are pled element-by-element, with complete case-law support, including:

• Dzwonar (CEPA),

• Pierce (public-policy termination),

• Abramson (temporal proximity),

• Fuentes (pretext),

• Rockwell Graphic Sys. (trade secret secrecy),

• Sons of Thunder and Wilson (implied covenant),

• Printing Mart-Morristown (tortious interference).

13. This Complaint is drafted to maximize:

• judicial clarity,

• procedural efficiency,

• factual transparency,

• element-based precision,

• and appellate survivability.

II. DEFINED TERMS

14. WattsProtect™ ("Invention") — Plaintiff's AI-based calibration-integrity and evidence-preservation system, independently created and maintained as a protected trade secret.

15. Non-Disclosure Agreement ("NDA") — The May 15, 2025 confidentiality contract requiring CBRE to cease all review, access, or discussion of Plaintiff's invention without written consent.

16. Legal Hold (Rule 37(e)) — Plaintiff's preservation notice issued May 15 requiring retention of all relevant ESI.

17. BeiGene-Issued Laptop ("ThinkPad") — The work device containing calibration records, evidence, and communications, subject to CBRE/BeiGene's attempted retrieval.

18. Policy 6.4 Disclosure — The required CBRE form for reporting outside inventions.

19. CBRE Management —

• Matt Miller,

• Patricia Gunn,

• Domini R. Lee,

• Matthew Eastwood.

20. George Murray (CBRE Staff) — Present at the May 8 calibration meeting where the hostile outburst occurred.

21. Worksite — The GMP facility operated by BeiGene where Plaintiff performed calibration duties.

PART II — JURISDICTION, VENUE, PARTIES, AND BEGINNING OF FACTUAL ALLEGATIONS

(Rewritten with Rule 1, 8, 10(b), 15(a)(2), 37(e), 54(c), and all cited case law integrated.)

III. JURISDICTION AND VENUE

22. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1).

23. This Court possesses supplemental jurisdiction under 28 U.S.C. § 1367(a) over all remaining state-law claims — including CEPA retaliation, Pierce public-policy discharge, NJTSA misappropriation, contract claims, wage claims, and tortious interference — because they arise from the same continuous nucleus of operative facts.

24. Venue is proper under 28 U.S.C. § 1391(b)(2) because all retaliatory acts, terminations, interrogations, interrogatory demands, HR contradictions, offboarding instructions, and misappropriation-related conduct occurred in the District of New Jersey, primarily at the GMP-regulated BeiGene worksite to which Plaintiff was assigned.

25. Defendants transact business within this District, direct operations within this District, employ individuals within this District, and committed wrongful acts within this District.

26. This jurisdiction and venue section satisfies the requirements of Rule 8(a)(1).

IV. PARTIES

27. Plaintiff, Andre Jason Watts, is a New Jersey resident, father, independent inventor, and former CBRE employee assigned to BeiGene's GMP facility. Plaintiff developed WattsProtect™ ("Invention") entirely outside employment and on his own time.

28. Defendant CBRE Group, Inc. ("CBRE") is a global corporation providing technical operations, facilities management, and engineering services. CBRE employed Plaintiff, controlled payroll and HR operations, and executed all actions forming the basis of retaliation, misappropriation, and termination.

29. CBRE acted at all relevant times through supervisors and agents including:

• Matt Miller;

• Patricia Gunn;

• Domini R. Lee;

• Matthew Eastwood;

• and other HR personnel.

30. Defendant BeiGene USA, Inc. ("BeiGene") operates GMP pharmaceutical laboratories in New Jersey. BeiGene supervised Plaintiff's calibration assignments and entered into joint communications with CBRE regarding Plaintiff's work, status classification, and offboarding.

31. Both Defendants qualify as "persons" under the DTSA and NJTSA, and both acted through employees whose conduct is attributable to the corporate entities as a matter of agency law.

V. FACTUAL ALLEGATIONS

(All facts pled with Rule 10(b) structure; all paragraphs numbered sequentially; all facts preserved; all enhancements integrated.)

A. Employment Background

32. Plaintiff was employed by CBRE as a Calibration Technician, performing daily calibration, verification, troubleshooting, and measurement-integrity tasks within a GMP-regulated environment.

33. His responsibilities included calibration of:

• temperature devices,

• pressure instruments,

• environmental sensors,

• automated lab instrumentation,

• measurement systems used for pharmaceutical quality control.

34. Plaintiff performed all tasks with precision and compliance consistent with GMP, FDA, and corporate quality-assurance standards.

35. Plaintiff routinely used a BeiGene-issued ThinkPad to complete calibration reports, SOP readings, system logs, and quality documentation — often remotely, as expected by the assignment.

36. Plaintiff developed a reputation for strong technical performance, integrity, and accuracy among both CBRE and BeiGene personnel.

37. In the course of his duties, Plaintiff identified systemic workflow deficiencies, audit-readiness gaps, and data-integrity vulnerabilities, informing the later creation of his independent invention.

B. Development of WattsProtect™ (“Invention”)

38. Between late 2024 and early 2025, Plaintiff independently developed WattsProtect™ (“Invention”), an AI-driven calibration-integrity, workflow-governance, and evidence-preservation architecture.

39. WattsProtect™ contains confidential modules including:

a. predictive calibration logic;

b. audit-trail intelligence;

c. chain-of-custody proof channels;

d. diagnostic workflows;

e. compliance-validation algorithms;

f. evidence-logging and integrity-tracking systems.

40. Under DTSA, 18 U.S.C. § 1839(3), and NJTSA, N.J.S.A. 56:15-2, the Invention qualifies as a trade secret because it:

• has independent economic value;

• is not known to others;

• could not be readily ascertained;

• was protected by reasonable secrecy measures.

41. Plaintiff maintained confidentiality by:

a. developing the Invention on his own time;

b. using only personal devices;

c. restricting disclosure;

d. preparing a detailed Non-Disclosure Agreement ("NDA");

e. issuing a Rule 37(e) Legal Hold later in May;

f. filing a provisional patent on April 30, 2025.

42. Plaintiff remained the sole inventor and sole owner of WattsProtect™ at all times.

43. On June 23, 2025, CBRE publicly admitted — in open court — that it made no ownership claim over Plaintiff's Invention.

C. May 5 Policy 6.4 Disclosure (Protected Activity)

44. On May 5, 2025, Plaintiff complied fully with CBRE Policy 6.4 by submitting a formal disclosure email to:

• Matt Miller,

• Patricia Gunn,

• Matthew Eastwood.

45. Plaintiff immediately signed the Policy 6.4 form.

46. The disclosure:

a. described the independent Invention;

b. asserted exclusive ownership;

c. requested confidential handling;

d. requested proper review;

e. confirmed no CBRE resources were used.

47. Policy 6.4 does not require an employee to surrender ownership or disclose confidential details of an invention absent safeguards.

48. Plaintiff acted in good faith and fulfilled all requirements.

49. Within 48 hours, CBRE began retaliatory escalation — a pattern central to CEPA (Dzwonar) and temporal proximity (Abramson) analysis.

D. May 5–7 — Immediate Retaliation After Disclosure

50. Supervisor Matt Miller told Plaintiff his invention created a “conflict of interest,” despite no policy, contract, or law supporting this false assertion.

51. Miller pressured Plaintiff with the ultimatum that he had to "choose between the invention and the job."

52. Under Dzwonar, such coercion is a textbook CEPA trigger.

53. On May 7, Plaintiff filed an internal retaliation complaint.

54. Immediately thereafter, hostility increased.

E. May 8 — Calibration Meeting (George Murray, CBRE; BeiGene Personnel)

55. On the morning of May 8, 2025, Plaintiff attended a scheduled calibration meeting involving:

• CBRE staff member George Murray,

• BeiGene personnel,

• other CBRE technical participants.

56. During the meeting, Murray suddenly slammed his hands on the table, creating a loud, aggressive, and hostile disruption.

57. This took place in a GMP environment requiring calm, controlled communication.

58. Plaintiff removed himself to prevent escalation.

59. Plaintiff intended to report the incident as a workplace-safety concern.

60. Instead of addressing this safety issue, CBRE used the remainder of the day to interrogate Plaintiff about his invention.

F. May 8 — Coerced Interrogation and Forced IP Exposure

61. Later that afternoon, Plaintiff was summoned by Matt Miller and Patricia Gunn, believing the meeting concerned Murray's outburst.

62. Instead, Plaintiff was subjected to an unannounced, coercive interrogation solely about his invention.

63. CBRE demanded access to confidential material with no NDA, no security safeguards, and no legal basis.

64. Plaintiff was pressured to show portions of the Invention on his personal cell phone.

65. Such conduct constitutes improper means under DTSA, NJTSA, and Rockwell Graphic Sys. v. DEV Indus., 925 F.2d 174, 179 (7th Cir. 1991).

66. The interrogation intensified retaliation and marked a decisive escalation.

G. May 8 — Removal From Worksite

67. At the end of the May 8 workday, Miller ordered Plaintiff to leave the worksite “with pay.”

68. No reason was given.

69. No written notice was provided.

70. No investigation basis was identified.

71. Removal occurred three days after Policy 6.4 disclosure — a CEPA-qualifying adverse action.

H. May 9–13 — Wage Delay and HR Contradictions

72. On May 9, Plaintiff did not receive his paycheck.

73. CBRE Payroll informed Plaintiff the delay resulted from Miller failing to approve the timesheet.

74. Meanwhile, CBRE People Services repeatedly confirmed Plaintiff was active, not suspended.

75. But BeiGene employee Felix Kwafo informed Plaintiff that an offboarding ticket had been opened.

76. This contradiction — HR saying “active” while BeiGene is told “offboard him” — is direct evidence of pretext under Fuentes, 32 F.3d at 765.

I. May 15 — NDA and Rule 37(e) Legal Hold

77. On May 15, Plaintiff submitted a formal Non-Disclosure Agreement (“NDA”) (See Exhibit A).

78. Plaintiff also issued a Rule 37(e) Legal Hold, requiring preservation of all relevant ESI.

79. These constitute protected activity under CEPA, DTSA, and public policy.

J. May 16 — Termination Within 24 Hours of NDA Submission

80. On May 16, CBRE terminated Plaintiff.

81. Termination occurred less than one day after Plaintiff asserted his rights through the NDA and Legal Hold.

82. This constitutes powerful temporal proximity evidence under Abramson, 260 F.3d at 288.

83. No legitimate reason was provided.

84. Termination was retaliatory, pretextual, and unlawful.

K. June Events — Continued Retaliation, Laptop Retrieval Attempt, Hearings

85. On June 3, Plaintiff learned of a false “side hustle” rumor regarding his Invention.

86. On June 13, BeiGene attempted to retrieve Plaintiff’s ThinkPad from his home while CBRE still listed him as active.

87. The ThinkPad contained calibration data, work records, and evidence.

88. On June 23, CBRE admitted no ownership over the Invention.

89. On June 30, the Court reaffirmed Plaintiff's right to preserve evidence.

PART III — CAUSES OF ACTION

COUNT I — RETALIATION UNDER CEPA (N.J.S.A. § 34:19-1 et seq.)

(Dzwonar v. McDevitt, 828 A.2d 893 (N.J. 2003); Abramson, 260 F.3d 265; Fuentes, 32 F.3d at 765)

90. Plaintiff repeats and incorporates ¶¶ 1–89.

91. To state a CEPA claim under Dzwonar, Plaintiff must allege:

(1) Protected activity;

(2) Employer's knowledge;

(3) Adverse employment action;

(4) Causal link.

1. Protected Activity

92. Plaintiff engaged in protected activity under CEPA when he:

a. submitted his May 5 Policy 6.4 disclosure identifying potential ethical violations and seeking correct compliance;

b. reported the hostile May 8 incident involving CBRE employee George Murray;

c. objected to CBRE's coerced interrogation and improper access demands;

d. issued an NDA on May 15;

e. issued a Rule 37(e) Legal Hold on May 15;

f. filed internal retaliation complaints.

93. CEPA protects disclosure of any activity Plaintiff reasonably believes violates “a law, rule, regulation, or clear mandate of public policy.” N.J.S.A § 34:19-3.

94. Plaintiff’s disclosures fall squarely under Pierce v. Ortho Pharm. Corp., 417 A.2d 505 (N.J. 1980).

2. Employer Knowledge

95. Miller, Gunn, and CBRE leadership had actual knowledge of Plaintiff’s protected activity through email, in-person communication, and written submissions.

3. Adverse Actions

96. Within days of his disclosure, CBRE:

a. accused Plaintiff of a “conflict of interest”;

b. coerced disclosure of private IP under threat;

c. removed him from the worksite;

d. interfered with wages;

e. issued contradictory HR status communications;

f. opened an offboarding ticket behind his back;

g. terminated him on May 16.

97. Termination is the ultimate CEPA adverse action.

4. Causal Link

98. Under Abramson v. William Paterson College, 260 F.3d at 288, “unusually suggestive” temporal proximity alone may establish causation.

99. Here, termination occurred within 24 hours of the NDA and Legal Hold.

100. Pretext is shown through inconsistent explanations, contradictions, false conflict claims, and the Murray incident sequence — meeting Fuentes, 32 F.3d at 765.

Result

101. Plaintiff has pled a CEPA claim with full clarity, completeness, and Twombly/Iqbal plausibility.

COUNT II — WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY (Pierce Claim)

(Pierce v. Ortho Pharm. Corp., 417 A.2d 505 (N.J. 1980))

102. Plaintiff incorporates ¶¶ 1–101.

103. Under Pierce, an employer may not discharge an employee for acting consistent with a clear mandate of public policy.

104. Plaintiff acted in furtherance of:

a. workplace safety;

b. data integrity;

c. confidentiality rights;

d. trade secret protections;

e. Rule 37(e) preservation duties.

105. Plaintiff's attempt to report the May 8 Murray incident is protected under public-policy safety principles.

106. Termination following such reporting violates Pierce and state jurisprudence.

COUNT III — MISAPPROPRIATION OF TRADE SECRETS (DTSA, 18 U.S.C. § 1836(b))

(Rockwell Graphic Sys., Inc. v. DEV Indus., 925 F.2d 174, 179 (7th Cir. 1991))

107. Plaintiff incorporates ¶¶ 1–106.

108. Under the DTSA, a trade secret is protected if it:

(1) derives independent economic value;

(2) is not generally known;

(3) is subject to reasonable measures to maintain secrecy.

109. WattsProtect™ meets all criteria:

a. unique calibration-integrity layers;

b. non-public design;

c. economic value;

d. reasonable secrecy measures (NDA, legal hold, private development).

110. Misappropriation occurs where an employer acquires or attempts to acquire a trade secret by wrongful means, including coercion and misuse of authority.

111. CBRE demanded Plaintiff reveal confidential components without any NDA, under threat of job loss.

112. CBRE coerced Plaintiff to reveal the Invention from his personal cell phone during the May 8 interrogation.

113. Such conduct constitutes “improper means” under DTSA § 1839(6).

114. CBRE attempted to access, obtain, or replicate the Invention for internal review without authorization.

115. Termination immediately after Plaintiff formalized trade-secret protections (NDA, Legal Hold) is direct circumstantial evidence of misappropriation intent.

COUNT IV — MISAPPROPRIATION UNDER NJTSA (N.J.S.A. § 56:15-1 et seq.)

116. Plaintiff incorporates ¶¶ 1–115.

117. The same conduct that violates DTSA violates the New Jersey Trade Secrets Act for the same reasons, using an analogous statutory framework.

118. CBRE’s coercive acquisition attempts, demands, and unauthorized interrogation satisfy misappropriation under NJTSA.

COUNT V — BREACH OF CONTRACT (NON-DISCLOSURE AGREEMENT, MAY 15)

(Contract elements: formation, performance, breach, damages)

119. Plaintiff incorporates ¶¶ 1–118.

120. On May 15, Plaintiff submitted a written NDA (Exhibit A).

121. The NDA required CBRE to:

a. cease all review of Plaintiff’s invention;

b. obtain written consent before discussion;

c. limit access;

d. maintain confidentiality.

122. CBRE breached by:

a. continuing to discuss the Invention internally;

b. continuing to interrogate Plaintiff;

c. taking adverse action (termination) within 24 hours;

d. attempting laptop retrieval to access confidential data.

123. Damages include lost wages, emotional distress, reputational harm, and the value of confidentiality rights.

COUNT VI — BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

(Sons of Thunder v. Borden, 690 A.2d 575; Wilson v. Amerada Hess Corp., 773 A.2d 1121)

124. Plaintiff incorporates ¶¶ 1–123.

125. New Jersey law implies a covenant preventing employers from acting “arbitrarily, capriciously, or unreasonably.”

126. CBRE acted with bad faith by:

a. misusing Policy 6.4;

b. creating false conflict claims;

c. withholding wages;

d. opening hidden offboarding tickets;

e. issuing contradictory HR classification statements;

f. terminating Plaintiff within 24 hours of asserting protected rights.

127. These acts violate the covenant.

COUNT VII — WAGE PAYMENT ACT (N.J.S.A. § 34:11-4.1 et seq.)

128. Plaintiff incorporates ¶¶ 1–127.

129. Plaintiff did not receive his May 9 paycheck.

130. CBRE Payroll confirmed the delay was due to Miller's failure to approve the timesheet.

131. CBRE failed to pay wages due on the regular payday, violating the Wage Payment Act.

COUNT VIII — TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

(Printing Mart-Morristown v. Sharp Elecs. Corp., 563 A.2d 31 (N.J. 1989))

132. Plaintiff incorporates ¶¶ 1–131.

133. Plaintiff had prospective future roles in calibration, GMP integrity, and AI-governance opportunities.

134. CBRE interfered through:

a. false conflict statements;

b. escalated retaliation;

c. misrepresentation to BeiGene;

d. misuse of authority;

e. termination.

135. Under Printing Mart, Plaintiff states a complete claim.

COUNT IX — DECLARATORY JUDGMENT (28 U.S.C. § 2201(a))

136. Plaintiff incorporates ¶¶ 1–135.

137. A real controversy exists regarding Plaintiff's exclusive ownership of WattsProtect™.

138. CBRE's June 23 courtroom admission confirms Plaintiff's rights.

139. A declaratory judgment is necessary to affirm these rights and prevent future disputes.

Understood — continuing exactly where we left off.

PART IV — PRAYER FOR RELIEF, JURY DEMAND, RULE 11 CERTIFICATION, AND CHRONOLOGY APPENDIX

VII. PRAYER FOR RELIEF

(Fed. R. Civ. P. 54(c); DTSA § 1836(b)(3); CEPA § 34:19-5; Declaratory Judgment § 2201; Rule 37(e))

WHEREFORE, Plaintiff respectfully demands that the Court enter judgment in his favor and against Defendants, jointly and severally, and award the following relief:

1. Declaratory Relief (28 U.S.C. § 2201(a))

140. A declaration that Plaintiff Andre Jason Watts is the sole and exclusive owner of the invention WattsProtect™ ("Invention"), including all intellectual property rights, trade secrets, algorithms, architecture, and derivative components.

141. A declaration that neither CBRE nor BeiGene has any claim, assignment right, ownership interest, shop-right interest, control, or usage entitlement in the Invention.

2. Injunction Under DTSA § 1836(b)(3)(A)

142. A permanent injunction prohibiting Defendants from:

a. accessing, reviewing, replicating, reverse-engineering, or analyzing any portion of the Invention;

b. requesting, surveilling, or retrieving Plaintiff's confidential materials;

c. taking any adverse action related to Plaintiff's protected disclosures;

d. interfering with evidence preservation under Rule 37(e).

3. Monetary Damages

(CEPA, DTSA, NJTSA, Wage Act, Tortious Interference, Pierce)

143. Compensatory damages for:

a. lost wages and benefits;

b. lost earning capacity;

c. loss of economic opportunities;

d. emotional distress;

e. reputational harm;

f. loss of professional standing;

g. harm resulting from misappropriation attempts.

144. Exemplary damages under DTSA § 1836(b)(3)(C) for willful and malicious misappropriation.

145. Exemplary damages under CEPA § 34:19-5 for knowing and willful retaliation.

146. Treble damages permitted under New Jersey statutory law, where applicable.

147. Interest (pre- and post-judgment) as allowed by law.

4. Attorneys' Fees and Costs

148. Although Plaintiff proceeds pro se, he requests:

a. attorney-fee shifting under DTSA § 1836(b)(3)(D) should he retain counsel;

b. fee awards under CEPA § 34:19-5;

c. litigation costs as the prevailing party.

5. Rule 37(e) Preservation Remedies

149. A Court-ordered preservation directive requiring CBRE and BeiGene to:

a. preserve all ESI relevant to Plaintiff's Policy 6.4 disclosure;

b. preserve all emails, Teams messages, texts, and system logs related to

• removal from the worksite,

• offboarding ticket creation,

• wage approvals,

• termination decisions,

• Murray's conduct, and

• June 13 retrieval attempts.

150. Adverse-inference remedies if spoliation is later discovered.

6. All Other Just Relief (Rule 54(c))

151. Such other and further relief as the Court deems just, equitable, proper, and consistent with the Federal Rules of Civil Procedure.

VIII. JURY DEMAND

(Seventh Amendment)

152. Plaintiff demands a trial by jury on all issues triable to a jury.

IX. RULE 11 CERTIFICATION

153. Plaintiff certifies under Fed. R. Civ. P. 11(b) that:

a. this Amended Complaint is submitted in good faith;

b. the factual allegations have evidentiary support;

c. the legal claims are warranted by existing law or a good-faith extension;

d. this filing is not submitted for any improper purpose;

e. Plaintiff is proceeding pro se and has made all reasonable efforts to comply with judicial standards.

X. CHRONOLOGY APPENDIX

(Judge-Friendly Table; Cross-Referenced to Complaint Paragraphs)

Respectfully submitted,

/s/ Andre Jason Watts

Andre Jason Watts

Plaintiff, Pro Se

[address optional if filing via ECF]

Email: [your email]

Phone: 732-853-4977

Dated: 24SEP____________________, 2025

(Insert filing date)

CERTIFICATION OF SERVICE

I hereby certify that on this date, I filed the foregoing Amended Complaint using the Court's ECF system, which will automatically send notice to all counsel of record.

/s/ Andre Jason Watts

Andre Jason Watts

Plaintiff, Pro Se

