**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

**Civil Action No. 3:25-cv-04483-RK-JTQ**

**CORRECTED THIRD AMENDED COMPLAINT**

**ANDRE JASON WATTS,**
Plaintiff, pro se,

v.

**CBRE, INC. (incorrectly identified in the current caption as CBRE GROUP, INC.) and BEIGENE USA, INC.,**
Defendants.

---

## PRELIMINARY STATEMENT

1. This action concerns alleged retaliation following Plaintiff's written calibration-compliance objection, alleged unauthorized internal use and disclosure of limited nonpublic technical information concerning an independently developed calibration-integrity project after a confined display, and delayed payment of earned wages.

2. On May 8, 2025, Plaintiff requested written management direction before proceeding through a proposed calibration method involving an unavailable fitting and fabrication, removal, or reconfiguration of equipment components. Later that day, CBRE management directed him to leave the worksite with pay pending an investigation into a possible conflict of interest. CBRE terminated his employment on May 16, 2025 under Policy 6.4.

3. The action is narrowed to four claims: retaliation under the New Jersey Conscientious Employee Protection Act; misappropriation under the Defend Trade Secrets Act; misappropriation under the New Jersey Trade Secrets Act; and violation of the New Jersey Wage Payment Law.

4. Unless expressly stated otherwise, the allegations are based on Plaintiff's personal knowledge. Matters concerning Defendants' internal communications, investigation records, electronic records, corporate relationships, and allocation of authority are alleged on information and belief because they are principally within Defendants' possession. Where an allegation is made on information and belief, the factual basis for the inference is stated.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b).

6. The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the related New Jersey claims because they form part of the same case or controversy.

7. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in Mercer County, New Jersey.

## PARTIES

8. Plaintiff Andre Jason Watts is a New Jersey resident and former Instrumentation and Electrical Calibration Technician assigned to BeiGene's Hopewell, New Jersey facility.

9. Defendant CBRE, Inc. is the CBRE entity that has appeared in this action and represented that it was incorrectly identified in the current caption as CBRE Group, Inc. Plaintiff alleges that CBRE employed him or acted through the CBRE employing operation that controlled his payroll, discipline, worksite removal, employment status, and termination.

10. Defendant BeiGene USA, Inc. operated the worksite, issued or controlled Plaintiff's work computer and site access, assigned or supervised site work, and participated in communications concerning Plaintiff's site status and offboarding.

11. Plaintiff pleads BeiGene's employment-related role in the alternative to the extent evidence establishes that it exercised sufficient control to qualify as an employer or joint employer under an asserted statute, acted jointly with CBRE, or directly participated in conduct giving rise to liability.

## FACTUAL ALLEGATIONS

***Employment and WattsProtect***

12. CBRE hired Plaintiff in January 2025 as an Instrumentation and Electrical Calibration Technician and assigned him to BeiGene's Hopewell facility.

13. Plaintiff's duties included calibration, verification, troubleshooting, and documentation of pressure, temperature, environmental, and other instruments used at the pharmaceutical site.

14. Plaintiff performed work in an environment governed by written procedures, quality controls, and current-good-manufacturing-practice expectations.

15. Before his CBRE employment, Plaintiff had formed A & N Electrical Repair LLC. Plaintiff disclosed that company during the hiring process, and CBRE allowed his employment to proceed after review.

16. Outside his assigned work and using personal time and resources, Plaintiff developed a nonpublic calibration-integrity and evidence-preservation architecture known as WattsProtect.

17. The alleged trade-secret subject matter is not the general ideas of calibration, audit trails, authorization, or evidence preservation. It is the specific nonpublic selection, sequencing, and interaction of: (a) stop, proceed, and escalate decision rules tied to defined calibration conditions; (b) role-based authorization gates, approval logic, and authority-change controls; and (c) an evidence-preservation workflow linking instrument identity and configuration, observed condition, actor, action, timestamp, authorization state, and supporting records into a verifiable chain. Plaintiff alleges that the asserted secret lies in the combination and interaction of those elements, not in isolated concepts that may be publicly known.

18. Plaintiff alleges that this combination derived actual or potential economic value from secrecy because it was designed to reduce calibration error, improve audit traceability, and preserve reliable evidence of technical decisions, and was not generally known or readily ascertainable through proper means.

19. Plaintiff developed the material on personal devices and personal time, limited disclosure, and communicated that WattsProtect was independently owned and confidential. He filed a provisional patent application on April 30, 2025, which he alleges was not publicly available during the events at issue and did not publicly disclose the confidential combination alleged here.

*May 5-7 Policy 6.4 Communications*

20. On May 5, 2025, CBRE management raised Policy 6.4 concerning outside employment or business interests. Plaintiff disclosed the existence of WattsProtect and asserted that it had been developed independently.

21. During a May 6, 2025 Teams call attended by Plaintiff, Matt Miller, and Patricia Gunn, Miller stated in substance that Plaintiff would have to choose between continued CBRE employment and continued work on WattsProtect. Plaintiff pleads the substance of the statement from personal recollection and does not represent it as a verbatim quotation.

22. On May 7, 2025, Plaintiff made an internal complaint concerning treatment he perceived as retaliatory following the Policy 6.4 communications. He also communicated his willingness to assist with instrument work associated with the parts washers.

*May 8 Compensation Communication and Return to Work*

23. Early on May 8, 2025, before arriving at the site, Plaintiff sent management a compensation-related communication. Plaintiff includes that communication only to state the day's sequence and does not allege that the compensation request itself constituted CEPA-protected activity.

24. Management directed Plaintiff to return ready to work and provided reporting instructions. Plaintiff confirmed that he was returning and ready to perform his assigned work.

25. Management also advised Plaintiff that his calibration expertise was needed for work involving a parts washer and directed him to report to the CUB. Plaintiff confirmed his readiness and desire to continue working for CBRE.

*First May 8 Meeting, Workplace Complaint, and Technical Objection*

26. After arriving, Plaintiff attended a scheduled calibration-related meeting with George Murray and other site personnel or coworkers. The assigned parts-washer work and the need for Plaintiff's calibration expertise were among the matters discussed.

27. During the meeting, Murray struck or slammed his hands on a desk or table. Plaintiff remembers the physical action and forceful manner but does not presently allege Murray's exact words.

28. Plaintiff left the immediate area to avoid escalation and then transmitted a workplace-conduct email reporting Murray's behavior. That email was separate from the technical calibration communication concerning the parts washer.

29. Plaintiff then went to the parts-washer equipment to address the calibration assignment discussed during the meeting.

30. The fitting ordinarily used to connect the calibration equipment to the pressure transmitter was not available. Plaintiff understood that a temporary fabricated configuration had previously been used to obtain a reading and that another proposed method would require fabricating, removing, or reconfiguring equipment components.

31. Plaintiff did not proceed through an undocumented fabricated or reconfigured method without written management direction because he reasonably believed such a method could affect calibration accuracy, equipment integrity, safety, and compliance with written calibration and quality requirements.

32. Plaintiff photographed the equipment and relevant configuration using his personal telephone. He then authored and transmitted from his BeiGene-issued computer a written calibration communication requesting management direction before proceeding.

33. The technical communication identified the unavailable fitting, the prior temporary configuration, and the proposed fabrication, component-removal, or reconfiguration method. Plaintiff requested written direction because he reasonably believed an unapproved or undocumented method could compromise calibration accuracy, equipment integrity, safety, and compliance with written calibration and quality requirements.

34. Based on Plaintiff's calibration responsibilities, training, and the information available to him, the concern bore a substantial nexus to 21 C.F.R. § 211.160(b)(4), which requires calibration of specified instruments and devices under an appropriate written program, and, to the extent applicable, 21 C.F.R. § 211.68(a). It also related to the site's written calibration and equipment-control requirements.

35. Plaintiff does not allege that he established an actual regulatory violation. He alleges that he reasonably believed an unapproved or undocumented configuration could conflict with applicable calibration and quality requirements. The governing site procedures and equipment classification are reflected in records controlled by Defendants.

36. Plaintiff specifically recalls transmitting the technical communication to George Murray and recalls including additional management personnel. Because he does not possess the native sent-message record, Plaintiff does not allege the complete recipient list as a matter of certainty.

37. Before losing access to the BeiGene-issued computer, Plaintiff forwarded a copy of the technical communication to his personal email account for preservation. He also preserved photographs and video relating to the equipment condition and proposed configuration. On information and belief, the native sent email, recipient fields, delivery information, metadata, attachments, and related internal communications remain or remained within electronic systems controlled by one or both Defendants.

***Second May 8 Meeting and Limited Telephone Display***

38. After transmitting the workplace-conduct complaint and technical communication, Plaintiff returned to the CUB. He observed Murray, Gunn, and Miller speaking inside an office, did not interrupt them, and began walking toward the main pharmaceutical building. Plaintiff then received a call directing him to return to the CUB.

39. Plaintiff returned and entered a second May 8 meeting with Miller and Gunn. Plaintiff expected the meeting to address his workplace-conduct complaint concerning Murray.

40. Miller and Gunn first questioned Plaintiff about custody of calibration equipment or standards. Plaintiff stated that he had not taken a Pelican case containing a calibration standard home and did not take company calibration standards home.

41. The questioning then shifted to Plaintiff's May 5 disclosure of WattsProtect, related communications, Policy 6.4, and whether WattsProtect presented a conflict with his employment.

42. Plaintiff attempted to explain that WattsProtect had been developed independently, was separate from his assigned CBRE work, and did not constitute a conflict of interest.

43. In the context of Miller's earlier choose-between statement, the ongoing Policy 6.4 review, and Plaintiff's effort to preserve his employment, Plaintiff felt pressure to explain the project and voluntarily initiated a limited display of slides or materials on his personal telephone. Plaintiff does not allege that Miller or Gunn expressly requested, ordered, or demanded that he display the telephone or its contents.

44. The limited display included nonpublic portions showing the relationship among WattsProtect's stop, proceed, and escalate logic, role-based authorization controls, and linked evidence-preservation workflow described in paragraph 17. Plaintiff did not display every decision rule, implementation detail, source-code element, technical dependency, or component of the asserted combination.

45. Before or during the display, Plaintiff communicated that WattsProtect was independently developed and confidential. The display was undertaken for the confined purpose of explaining why Plaintiff believed the project did not conflict with his employment. Any express or implied consent was limited to direct viewing by Miller and Gunn and immediate discussion reasonably necessary for that explanation, with the information remaining confidential. Plaintiff did not transfer the underlying files, surrender his telephone, grant a license, transfer ownership, or authorize post-meeting capture, technical memorialization, retention, onward disclosure, reverse engineering, or use beyond that confined purpose.

46. Plaintiff observed that Miller held a pen and that Gunn had an open laptop, but those observations do not establish that either person took notes, photographed the display, or electronically recorded it. Plaintiff does not allege as an established fact that anyone copied the original slides, electronically recorded the meeting, publicly disclosed the content, or used it in an external commercial product.

***Stated Investigation, Removal, and Internal Records***

47. After the second meeting, Plaintiff continued performing assigned work until later that afternoon.

48. When Plaintiff later returned to the CUB, Miller approached him and informed him in substance that he was being directed to leave the worksite with pay pending an investigation into a possible conflict of interest.

49. At that time, WattsProtect was the outside project CBRE had identified and questioned as the possible conflict. Plaintiff understood the stated investigation to concern a possible Policy 6.4 conflict involving WattsProtect, but because CBRE did not provide an investigative scope, Plaintiff does not know precisely what subjects or materials CBRE investigated.

50. Plaintiff was not provided that day, or before his termination, with a written investigative allegation, scope, conflict determination, investigative report, supporting documents, or notice that the investigation had been completed.

51. On information and belief, based on the structured WattsProtect questioning, management's direct viewing of limited functional content, the same-day removal pending a possible-conflict investigation, the continuation of the Policy 6.4 review, pretermination offboarding activity, and the later termination under Policy 6.4, CBRE created, received, or maintained internal investigation or decision materials concerning WattsProtect.

52. On information and belief, CBRE employed at least some displayed nonpublic technical substance after the meeting as an input to its Policy 6.4 review by: (a) evaluating or characterizing whether the relationship among WattsProtect's decision rules, authorization logic, and evidence-preservation workflow overlapped with Plaintiff's assigned work or created a conflict; (b) communicating that functional characterization to one or more persons participating in Plaintiff's removal, offboarding, investigation, or termination; and (c) using that characterization to support or inform the resulting employment decision. Plaintiff alleges this post-meeting use concerned the displayed functional substance, not merely the name or existence of WattsProtect.

53. The information-and-belief allegation does not rest on access alone. Before the second meeting, management already knew the name and asserted independent status of WattsProtect. During the meeting, management viewed limited functional content; afterward, CBRE immediately removed Plaintiff pending a conflict investigation, continued the Policy 6.4 process, and terminated him under that policy without providing the scope, report, determination, or supporting documents. On information and belief, one or more internal notes, summaries, communications, or review materials memorialized or conveyed at least some specific functional substance. The existence, content, recipients, and use of those materials are principally within CBRE's possession.

***Subsequent Employment and Payroll Events***

54. Plaintiff thereafter left the worksite as directed and lost access to the BeiGene-issued computer and its native sent-mail records.

55. On May 9, 2025, Plaintiff sent a written communication seeking clarification of his status and return-to-work instructions.

56. Plaintiff's regularly scheduled May 9, 2025 earnings statement, covering the pay period from April 20 through May 3, 2025, reflected zero gross pay, zero net pay, and zero paid hours. Plaintiff did not receive the earned wages due on that regular payday. Payroll communications attributed the nonpayment to incomplete local managerial approval of his time and indicated that corrective or off-cycle processing would occur. CBRE subsequently issued a corrective payment dated May 19, 2025 for 80 hours, reflecting gross wages of $4,423.20 and net pay of $3,241.75.

57. On May 13, CBRE People Services communicated concerning Plaintiff's employment status. Before CBRE issued the termination letter, Plaintiff also learned from a BeiGene information-technology representative that an offboarding process or ticket had been initiated.

58. On May 15, Plaintiff sent communications concerning the continued confidentiality of WattsProtect and preservation of potentially relevant electronically stored information. Those communications reinforced that Plaintiff did not consent to unrestricted retention, disclosure, or use of the project's nonpublic technical content.

59. On May 16, CBRE terminated Plaintiff, citing outside employment or activity under Policy 6.4 and characterizing the prior period as administrative leave.

60. Plaintiff alleges that the stated reason was inconsistent with CBRE's prior review of his preexisting company and with the timing of the May 8 written technical objection, same-day worksite removal, stated investigation, and pretermination offboarding. The same-day

removal, termination eight days later, prior choose-between statement, and asserted inconsistencies support a reasonable inference of retaliatory motive.

61. CBRE exercised authority over Plaintiff's hiring, payroll, discipline, employment status, worksite removal, investigation, and termination. BeiGene controlled or influenced work assignments, site access, the issued computer, and offboarding. The precise allocation of authority is reflected in Defendants' records.

62. George Murray was a CBRE employee whom Plaintiff understood to have operational or supervisory responsibilities, and Plaintiff specifically recalls transmitting the May 8 technical objection to him. On information and belief, the communication was delivered to Murray and any additional recipients, and one or more recipients communicated or made it available to persons involved in Plaintiff's worksite removal or employment status. The complete recipient list, delivery records, internal dissemination, and decision communications are principally within Defendants' possession.

**COUNT I - RETALIATION UNDER THE NEW JERSEY CONSCIENTIOUS EMPLOYEE PROTECTION ACT**

63. Plaintiff incorporates paragraphs 1 through 62.

64. Plaintiff reasonably believed that proceeding without the ordinary fitting and through an unapproved or undocumented fabricated, component-removal, or reconfiguration method could violate or materially depart from laws, regulations, written procedures, or clear mandates of public policy concerning calibrated equipment, pharmaceutical quality, and safety.

65. Based on Plaintiff's calibration responsibilities, training, and the information available to him, the complained-of conduct bore a substantial relationship to 21 C.F.R. § 211.160(b)(4), and, to the extent the equipment was covered, 21 C.F.R. § 211.68(a), as well as the site's written calibration and equipment-control requirements.

66. Plaintiff engaged in whistleblowing activity under N.J.S.A. 34:19-3(c) by objecting in writing, identifying the compliance concern, and requesting written management direction before proceeding.

67. Plaintiff specifically recalls transmitting the communication to Murray. On information and belief, the communication was delivered to Murray and any additional recipients, and one or more recipients communicated or made it available to persons involved in Plaintiff's worksite removal or employment status.

68. Plaintiff suffered adverse employment actions, including removal from the worksite, loss of system and site access, initiation of offboarding, and termination.

69. The same-day worksite removal, pretermination offboarding, termination eight days after the objection, and asserted inconsistencies in the stated reason support a plausible causal connection.

70. CBRE is alleged to be liable as Plaintiff's employer. BeiGene is alleged to be liable under CEPA only if the evidence establishes that it qualified as Plaintiff's employer or joint employer within the statute and participated in the adverse action. Plaintiff pleads that alternative role on information and belief.

71. As a direct and proximate result, Plaintiff suffered lost compensation and benefits, loss of employment, emotional distress, and other damages recoverable under CEPA.

**COUNT II - MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS ACT (AGAINST CBRE)**

72. Plaintiff incorporates paragraphs 1 through 62 only to the extent consistent with this Count.

73. The asserted trade secret is the bounded nonpublic combination described in paragraph 17: the specific selection, sequencing, and interaction of calibration-condition decision rules, role-based authorization and authority-change controls, and a linked evidentiary chain. Plaintiff does not claim exclusive ownership of calibration, authorization, audit trails, or evidence preservation as general concepts.

74. Plaintiff took reasonable measures under the circumstances to preserve secrecy by developing and storing the material on personal devices, limiting access and disclosure, identifying the project as independently owned and confidential, displaying only limited portions for a confined employment-review explanation, retaining the underlying files, and withholding authorization for post-meeting capture, technical memorialization, retention, onward disclosure, reverse engineering, or use outside that confined purpose.

75. The asserted combination derived actual or potential independent economic value from not being generally known and not being readily ascertainable through proper means by persons who could obtain economic value from its disclosure or use. The information related to a calibration-integrity product or service intended for use in technical and pharmaceutical operations engaged in interstate commerce.

76. During the May 8 meeting, CBRE managers obtained actual knowledge of limited confidential content when Plaintiff voluntarily initiated the confined display. Plaintiff does not allege that Miller or Gunn expressly requested, ordered, or demanded the display, and he does not rely on generic employment pressure, standing alone, as statutory improper means. He does not allege that the initial direct viewing itself was an improper acquisition.

77. Miller and Gunn knew or had reason to know that WattsProtect was independently owned and confidential and that the display occurred for a limited employment-conflict explanation. Those circumstances gave rise to a duty to preserve secrecy and to limit any use or disclosure to the consented purpose. See 18 U.S.C. § 1839(5)(B)(ii)(II). Any express or implied consent was confined to direct viewing and immediate discussion reasonably necessary for the stated explanation; it did not authorize post-meeting capture, retention, technical memorialization, onward disclosure, or use of the displayed substance for a purpose exceeding that limited consent.

78. Immediately after management questioned Plaintiff and viewed the limited content, Miller later directed Plaintiff to leave with pay pending an investigation into a possible conflict. WattsProtect was the project CBRE had identified and questioned as that possible conflict. CBRE continued the Policy 6.4 process, pretermination offboarding activity occurred, and CBRE terminated Plaintiff under Policy 6.4 without providing an investigative scope, report, determination, or supporting documents.

79. On information and belief, supported by paragraphs 51 through 53 and 78, CBRE used and internally disclosed at least some of the displayed nonpublic technical substance after the meeting by reducing it to or employing it in a functional characterization of WattsProtect,

communicating that characterization to persons involved in the investigation or employment decision, and using it as an input to the Policy 6.4 determination and resulting adverse action. The alleged corporate benefit was the use of nonpublic technical information to conduct and support CBRE's own conflict and employment decision without a license or compensation. This allegation concerns functional substance, not mere awareness of the project's name or existence.

80. At the time of the alleged post-meeting use or internal disclosure, CBRE knew or had reason to know that the knowledge had been acquired under circumstances requiring continued secrecy and limiting use. Plaintiff alleges that post-meeting use or disclosure exceeding the confined consent constitutes misappropriation under 18 U.S.C. § 1839(5)(B), even though the initial direct viewing is not alleged to have been an improper acquisition.

81. Plaintiff does not allege recording, copying of the original slides, public disclosure, or external commercial exploitation as established facts. Nor does he rely on access alone. He alleges a specific post-access use and internal-disclosure pathway on information and belief, supported by the immediate investigation sequence and employment decision, while acknowledging that the investigation records, notes, recipients, and decision materials necessary to prove or disprove that allegation are principally within CBRE's possession.

82. As a direct and proximate result of the alleged misappropriation, Plaintiff alleges loss of exclusive control over the confined technical disclosure, protective and investigative expense, and, to the extent proven to have been caused by the unauthorized use in the Policy 6.4 process, economic loss associated with the adverse employment decision. Any actual loss, unjust enrichment, reasonable royalty, diminution in value, or other relief remains subject to discovery and proof.

83. Plaintiff seeks relief under the DTSA only upon proof of a qualifying trade secret, reasonable secrecy measures, the required interstate-commerce connection, unauthorized use or disclosure within the statutory definition, causation, and entitlement to the relief requested.

## COUNT III - MISAPPROPRIATION UNDER THE NEW JERSEY TRADE SECRETS ACT (AGAINST CBRE)

84. Plaintiff incorporates the allegations supporting Count II.

85. The bounded confidential combination is alleged to constitute a trade secret under N.J.S.A. 56:15-2 because it was not generally known or readily ascertainable, had actual or potential economic value from secrecy, and was the subject of reasonable efforts to maintain secrecy.

86. New Jersey law defines improper means to include breach of an express or implied duty to maintain secrecy or limit use or disclosure, and access that is unauthorized or exceeds the scope of authorization. N.J.S.A. 56:15-2. To the extent CBRE caused the displayed substance to be captured, technically memorialized, retained, or made accessible after the confined direct viewing, Plaintiff alleges on information and belief that the resulting acquisition exceeded the scope of authorization and/or occurred through breach of an implied duty to preserve secrecy and limit use.

87. Alternatively and additionally, for the reasons stated in paragraphs 76 through 81, Plaintiff alleges on information and belief that CBRE internally disclosed or used specific nonpublic functional substance without consent by communicating and employing it in the continued Policy 6.4 investigation and employment decision, while knowing the information was

confidential and that any post-meeting acquisition or retention exceeded the confined authorization or breached the duty limiting use and disclosure.

88. Plaintiff does not allege recording, copying of the original slides, public disclosure, or external commercial exploitation as established facts. The scope of any post-meeting capture, memorialization, retention, access, internal disclosure, or use remains subject to discovery and proof from records principally within CBRE's possession. Plaintiff seeks only remedies authorized by N.J.S.A. 56:15-3 and 56:15-4 upon proof of every statutory element and cognizable harm or unjust enrichment.

**COUNT IV - NEW JERSEY WAGE PAYMENT LAW (AGAINST CBRE)**

89. Plaintiff incorporates the allegations concerning CBRE's employment and payroll responsibility and the May 9 wage payment.

90. CBRE was responsible for paying Plaintiff's earned wages on the regular payday.

91. Plaintiff's regularly scheduled May 9, 2025 earnings statement reflected gross pay of $0.00, net pay of $0.00, and zero paid hours for the pay period ending May 3, 2025, and Plaintiff did not receive the earned wages due on that regular payday.

92. Payroll communications attributed the nonpayment to incomplete local managerial approval of Plaintiff's time. CBRE subsequently issued a corrective payment dated May 19, 2025 for 80 hours, reflecting gross wages of $4,423.20 and net pay of $3,241.75 - ten calendar days after the regular payday. Plaintiff alleges that the failure to pay earned wages on the regular payday violated N.J.S.A. 34:11-4.2.

93. Plaintiff gives full credit for the May 19 corrective payment. He seeks only relief legally available for the delayed May 9 payment and supported by the payroll and banking records; he does not seek a second recovery of the wages already paid.

**PRAYER FOR RELIEF**

94. WHEREFORE, Plaintiff requests judgment in his favor and the following relief only to the extent authorized by law and supported by the evidence:

   a. compensatory damages, including back pay, front pay or reinstatement where appropriate, lost benefits, and recoverable noneconomic loss under CEPA;

   b. damages, reasonable-royalty or unjust-enrichment relief where legally available, and narrowly tailored equitable relief under the DTSA and NJTSA upon proof of misappropriation;

   c. statutory wage relief legally available for the delayed May 9 payment, with full credit for the May 19 corrective payment;

   d. prejudgment and post-judgment interest;

   e. taxable costs and any fee-shifting relief for which Plaintiff becomes legally eligible;

   f. preservation or injunctive relief only upon a developed evidentiary showing satisfying the governing standard; and

   g. such other and further relief as the Court deems just and proper.

**JURY DEMAND**

95. Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Andre Jason Watts
Andre Jason Watts
Plaintiff Pro Se
28 Wilson Street
North Brunswick, New Jersey 08902
Telephone: 732-853-4977
Email: andrewatts23@gmail.com
Dated: July 23, 2026

